**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ARTURO RAMOS et al., | ) | |
| | ) | Case No. 14-CV-2556 |
| Plaintiffs, | ) | |
| | ) | Judge Joan B. Gottschall |
| v. | ) | |
| | ) | |
| OFFICER ROBERT DREWS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Horacio Vazques-Perez ("Perez") bought a house in the Village of
Carpentersville, Illinois ("the Village" or "Carpentersville") and held a housewarming party on
the night of May 26, 2012. Pls.' Resp. to Defs.' Am. Rule 56.1 Stmt. Material Facts ("Pls.'
Resp. to ASMF") ¶ 110, ECF No. 312. Carpentersville police officer and defendant Donald
Wells ("Wells") went to the home in response to a noise complaint. *See id*. ¶ 56 (partially
disputed fact). The parties dispute nearly every important aspect of what happened next.
Defendant Wells and defendant Robert Drews ("Drews") ultimately arrested Perez, plaintiff
Arturo Ramos ("plaintiff Ramos"), and plaintiff Maria Rentaria ("Rentaria") and charged them
variously with felony battery of a police officer and resisting arrest. S*ee* Defs.' Resp. to Pls.'
L.R. 56.1(a)(3)(B) Am. R. 56.1 Stmt. Add'l Facts ("Pls.' Resp. to Defs.' ASAF") ¶¶ 1–3, ECF
No. 309; *see also* 720 ILCS 5/12-3.05(d)(4)(i). Each pleaded guilty, with a plea agreement, to
misdemeanor battery, *see* 720 ILCS 5/12-3(a)(2), in February 2014. Defs.' Resp. to Pls.' ASAF
¶¶ 4–6.

Plaintiffs filed this lawsuit in April 2014, alleging Fourth Amendment excessive force claims under 42 U.S.C. § 1983. The case proceeded through extensive discovery and precipitated the filing of six amended complaints.

The court has before it defendants' motion for summary judgment and a motion made by plaintiffs to strike portions of defendants' Local Rule 56.1(a)(3) statement of facts. Defendants primarily contend that plaintiffs' excessive force claims are barred by the doctrine of *Heck v. Humphrey*, 512 U.S. 477 (1994), because a favorable judgment here would imply the invalidity of their convictions. Much of the balance of the briefing raises allegations of skullduggery and litigation misconduct. Defendants ask the court to dismiss this action as a sanction for plaintiffs' alleged misconduct. For the following reasons, the court grants the motion for summary judgment in part and denies it in part.

## I. Summary Judgment Principles

### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The underlying substantive law governs whether a factual dispute is material: 'irrelevant or unnecessary' factual disputes do not preclude summary judgment." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (quoting *Anderson*, 477 U.S. at 248). In resolving summary judgment motions, "facts must be viewed in the light most favorable to," and all reasonable inferences from that evidence must be drawn in favor of, "the nonmoving party [but] only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007);

*Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 644 (7th Cir. 2016) (citing *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016)).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary" (citation omitted)). After "a properly supported motion for summary judgment is made, the adverse party must" go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted); *see also Modrowski*, 712 F.3d at 1169 (stating party opposing summary judgment "must go beyond the pleadings (*e.g.,* produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor") (citations and quotations omitted). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

### B. Local Rule 56.1 Statements

Local Rule 56.1 creates a procedure for presenting facts that a party contends are material at summary judgment. Specifically, Local Rule 56.1(a)(3) requires a party moving for summary judgment to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (quoting L.R. 56.1(a)(3)). Each paragraph of the movant's facts must include "specific references to the affidavits, parts of the

record, and other supporting materials relied upon to support the facts set forth in that paragraph." L.R. 56.1(a). The "[f]ailure to submit such a statement constitutes grounds for denial of the motion." *Id.* Local Rule 56.1(b)(3) requires the nonmoving party to submit a response to each statement of fact provided by the movant, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B). The nonmoving party may also present a separate statement of additional facts "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(C). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." *Id.* Similarly, "[i]f additional material facts are submitted by the opposing party . . ., the moving party may submit a concise reply in the form prescribed in that section for a response." L.R. 56.1(a). If the movant fails to respond properly to the opposing party's statement of additional facts, those facts will be deemed admitted. *Id*.

### C. Objections To Summary Judgment Evidence

Federal Rule of Civil Procedure 56(c)(2) allows "[a] party [to] object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." As this language makes clear, "[t]he evidence need not be admissible in form, but must be admissible in content" to be considered at summary judgment. *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016) (citing *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–68 (7th Cir. 1994)); *see also Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014). Because the parties are in a better position to know what evidence can be produced in an

admissible form at trial, the court does not ordinarily raise objections to summary judgment exhibits on its own initiative. *See Wheatley*, 826 F.3d at 420; *Olson*, 750 F.3d at 714; *Lockwood v. McMillan*, 237 F. Supp. 3d 840, 848 n.3 (S.D. Ind. 2017) (refusing to reach hearsay issue not raised by party).

## II. Factual and Procedural Background

Certain facts about the events of the night of May 26, 2012, are undisputed. Except where otherwise noted, the following recitation takes the facts in the light most favorable to plaintiffs.

Plaintiff Perez had recently bought a house in Carpentersville and was holding a get together. Pls.' Resp. to Defs.' ASOF ¶ 110. Plaintiffs Ramos and Rentaria, who are married, attended the get together. Ramos Dep. 7:14–17, 11:5–12, ECF No. 300–28. Plaintiff Ramos had consumed at most "four" beers before the police arrived. Pls.' Resp. to Defs.' ASOF ¶ 112 (quoting Ramos Dep. 16:24). Defendant Wells went to the house in response to a noise complaint, though whether it was the first or second such complaint made that evening is unclear. *See id.* ¶ 56. Wells arrived at the home first. *See id.* ¶ 125. Drews arrived a bit later. *Id.* At least one other officer, defendant Ramos, was present, but plaintiffs have no complaint with his conduct. *See id.* ¶117.

Wells arrived at the home around 11:00 p.m. He saw three women standing at the corner of the house and asked to speak with the homeowner. *Id.* ¶ 57 (undisputed fact). "Immediately before the police arrived, plaintiff Ramos went to his car to retrieve a karaoke CD and walked to his car with a beer in his hand." *Id.* ¶ 112. He got out of his car and began walking toward the garage, still carrying a beer. *Id.* ¶ 113. For the most part, the parties' deposition testimony about what happened next diverges at this point.

5

### A. Plaintiff Ramos

Ramos testified that he did not at any time "resist arrest physically." Ramos Dep. 61:13–16. According to his deposition, he saw "the police arrive" as he was stepping out of his car with the CD. *Id.* at 13:4–21. He "had the CD in [his] pocket and had the beer in [his] hand" as he approached Wells. *Id.* at 15:8–9. Wells "became very angry and aggressive" and asked to speak with the homeowner. *Id.* at 16:13–14; *see also id.* at 16:8–19. Wells spotted Ramos approaching carrying a beer and demanded to know "who he was," asked for his identification, and "accused" him of driving under the influence of alcohol. *Id.* at 17:16–18:4. Ramos produced his identification and "tried to explain" that he had gone to his car to get a CD, but Wells "wouldn't let [Ramos] explain anything," called him "stupid," and "took [him] to the [police] car and arrested [him] right away." *Id.* at 18:11–18. In response to specific questioning, Ramos stated that he never yelled or screamed at Wells. *See id.* at 18:19–24. Ramos testified as follows about what happened next:

> A. To get to that, I kind of have to explain what happened from there since I was handcuffed against the car. Then [plaintiff] Horacio [Perez] comes out because my wife went and called him because that was – [Wells] wanted to speak to the owner of the house so Horacio then comes out.
>
> . . . .
>
> A. [Horacio] came out of the house and he wanted to know what was going on. He was talking in Spanish at the time. And he was saying what was going on. This is a free country. Those are the words I remember. So Officer Wells handcuffed him and somehow – well, he was handcuffed. And at the same time Officer Drews had arrived and came running with the TASER and Horacio was already handcuffed. So I think he got pushed or at the time he got hit with the TASER, he fell down unprotected and he hit his chin on the ground and the officers were on top of him at the time because the TASER was very loud. It sounded like a shot or something. Loud.
>
> Q. When you say you thought Horacio had been pushed, can you describe to me what you saw or why you used the word "think"?

A.  He got – I think he was knocked by the shot, by the TASER on the ground because he yelled and then he was dropped on the ground and the two – at least two police officers were on top of him.

Q.  And the two police officers that were on top of him, do you know who those officers were?

A.  It was Wells and I don't recall who else.  Because right after that, right after he hit Horacio, he came back to me where I was in the car already handcuffed for awhile.  He came back to me and tased me and hit me in the ribs too with the TASER.

Q.  When you say "he," you're saying Officer Wells?

A.  Officer Wells, yes.  Right after he hit Horacio he came towards me to hit me.

. . . .

Q.  So then what happened?

A.  So Officer Drews, again, he came to hit me a couple of times.  And I asked him why are you doing it because I'm already handcuffed.  He just ran back by the car and that was it.  But also right after that, my wife Maria was trying to film with her phone.  And Officer Drews goes to approach her and takes the phone away from Maria.

Ramos Dep. 20:1–23:16.  Ramos later testified Drews tased him on the left side of his ribs.  *Id.* at 26:12–24.  Drews then took Rentaria's phone.  *See id.* at 23:9–16.  Ramos believed that Drews "was getting ready to hit [Rentaria]."  *Id.* at 28:14–15 (based on Rentaria's statements to plaintiff Ramos).  He never saw Rentaria use force when Drews took her phone.  *Id.* at 28:6–29:15.

**B.  Plaintiff Perez**

Perez testified that the party started around 6:00 p.m.  Perez Dep. 9:13.  He had "three to four beers" before the police arrived.  *Id.* at 10:7.  According to his testimony, Perez was in his garage when Wells arrived.  *Id.* at 12:18–19.  His wife told him that a police officer wanted to speak with the homeowner.  *Id.* at 12:16–20.  Perez came out of the garage.  He described the

officer as "hyper or just altered" and testified that the officer appeared "aggressive" and "nervous." *Id.* at 14:15–15:4.

Wells asked Perez and Ramos for identification. *Id.* at 13:5–14:10. They produced it, and the officer took it to his police car, presumably to check it. *Id.* at 14:10–11. Plaintiff Ramos followed the officer, and the officer immediately arrested him and called for backup. *Id.* at 15:10–18. Perez testified that plaintiff Ramos was standing, handcuffed, three or four feet from the police car. *Id.* at 16:5–16.

Perez walked down the driveway and asked why Ramos had been arrested. *Id.* at 16:19–21. The second officer then arrived, and Wells handcuffed Perez. *Id.* at 19:21–22. Subsequently, Drews tased Perez in the side of the stomach, causing Perez to fall to the ground. *Id.* at 19:23–24. He felt multiple police officers on top of him and lost consciousness at one point. *Id.* at 20:20–23, 24:7–9. Perez estimated that he was on the ground for three or four minutes. *Id*. at 21:22–23.

### C. Plaintiff Rentaria

According to her deposition, Rentaria offered to interpret for Wells when he arrived. Rentaria Dep. 11:11–13. Wells instead asked for the home owner and began shouting that he wanted the homeowner's identification. *Id.* at 11:19–22. Ramos approached Wells at about this time. *Id.* at 21–22. Wells began shouting at Ramos, demanding to know who he was. *Id*. at 12:10–11. Wells then arrested Ramos, according to Rentaria. *Id.* at 15:15–16. Rentaria testified that Perez "was just asking what was going on" when he was arrested. *Id.* at 15:23–24.

Drews subsequently arrived and tased Ramos, who was still handcuffed. *See id*. at 18:16–20. The deposition excerpt in the record does not include many details about the officers' interactions with Perez. Rentaria testified that Drews and another officer jumped on Perez. *Id.*

at 16:15–24. Both officers beat him, though not on the head, and one of the officers (Rentaria could not say which) struck Perez at least once with a billy club. *Id.* at 17:1–18. Finally, Rentaria testified affirmatively that Perez did not resist arrest. Rentaria tried to record a video of the incident with her phone. Seeing this, Drews took the phone from her.

### D. Defendant Wells

Wells testified that on May 26, 2012, he was dispatched to be Drews' backup on a noise complaint, but he arrived at the home first. Wells Dep. 6:6–12. He heard loud music, approached the house, and "asked to speak to the homeowner." *Id.* at 7:23. Perez's wife, with whom Rentaria was standing, responded that she was a homeowner. *Id.* at 8:2–3. A short discussion followed. Wells asked her for her identification, and she went into the house apparently to retrieve. *Id.* at 8:10–14. Perez returned with his wife. *Id.* at 8:23. Wells took Perez aside for a private conversation. *Id.* at 9:1–14. He explained why he was there, that this was the second noise complaint, and that Perez would be cited for a noise violation. See *id.*

When this discussion started, plaintiff Ramos was in a car parked at the bottom of the driveway. *Id.* at 11:4–23. He got out of the car and walked up the driveway toward Wells and Perez, beer in hand. *Id.* at 13:19–21. Wells told plaintiff Ramos that it was "stupid for him to be in a running car with an open beer in his hand" and that he would receive a written citation for having an open container in a car. *Id.* at 14:5–24. Wells returned to his police car to write citations for Perez and Ramos. *Id.* at 15:8–12. Ramos then approached the police car. *Id.* at 17:4–9. Ramos asked Wells why he still had Ramos' identification. *Id.* at 17:12. Wells responded by telling Ramos to return to the driveway. *Id.* at 17:14. Ramos did not comply, however. *Id.* at 20:21. Instead, he got closer and asked Wells to return his identification. *Id.* Drews then arrived, and Ramos "backed off." *Id.* at 21:7–8. A "verbal altercation followed, and

Ramos "got in [Drews'] face." *Id.* at 21:9–21. Drews decided to arrest Ramos. *Id.* Ramos resisted, though Wells' testimony includes only a few details. See *id.* at 22:1–3. Wells assisted Drews in the ensuing struggle by "grabbing the other arm of Mr. Ramos . . . [and] placing [plaintiff Ramos] against the back of the driver's side squad." *Id.* at 22:4–10. Wells "drive-stunned" Ramos once on the "left side of [his] body" using his taser. *Id.* at 22:13–20. According to defendant's expert witness, in "drive stun" mode, the "electrodes of the [taser] are typically 'driven' into the skin of the subject to cause pain." ECF No. 300–18 at 5.

Wells testified that he tased Perez twice. Wells Dep. at 25:24. His deposition testimony does not give the specific reasons he tased Perez. He mentions once that defendant Ramos, another police officer, went "hands on" with Perez during the incident. *Id.* at 40:22–24. Drews did not tase anyone that day, per Wells' testimony. *Id.* at 38:10–11.

### E. Defendant Drews

Defendant Drews' deposition testimony goes into considerably greater detail about the events of May 26, 2012. When Drews arrived at Perez's house, Wells was parked near the end of the driveway. Drews Dep. 8:19–20. Drews saw "several subjects" near Wells' car. *Id.* at 9:9–11. As he got out of his car, he overheard Wells tell someone (he does not recall whom) that a noise citation would be issued. *Id.* at 10:12–14, 11:11–13. Wells and Drews had a conversation "about what was taking place." *Id.* at 11:7–9, 17:23–24. Ramos approached the two as they were talking. *Id.* at 18:5–12. Drews testified that he believed that Ramos "got out of a running vehicle with the music turned up," although Drews did not actually see Ramos leave the car. *Id.* at 18:5–12, 25:4–19. Ramos "yell[ed] and scream[ed]" at the officers, according to Drews. *Id.* at 24:12–13. Drews "told Ramos to turn off the music and go inside." *Id.* at 27:6–7.

Ramos "got into [Drews'] face literally, less than a foot away and was yelling at [Drews]." *Id.* at 27:16.

Continuing the version of events set forth in Drews' deposition, he told Ramos two more times to return to the house. *Id.* at 28:11–13. Ramos kept leaning into Drews and responded, "You don't tell me what the fuck to do." *Id.* at 29:5–6. Drews told Ramos that he was under arrest and grabbed Ramos' right wrist "almost immediately." *Id.* at 30:5–9. Ramos fought Drews, temporarily breaking his grip. *Id.* at 30:24–31:4. Wells grabbed Ramos' other arm, and the three began to struggle. *See id.* at 31:6–24. Ramos ended up against a car with the officers trying to get his hands behind his back to handcuff him. *See id.* at 30:6–32:17. Ramos continued to "actively resist[ ]," according to Drews. *Id.* at 32:14. Ramos "twist[ed]" and "pus[ed] off the car" in an effort to break free. *Id.* at 32:16–17. As the three struggled, Rentaria and "[s]everal family members" got in Wells and Drews' faces. *Id.* at 32:19–20. In an effort to break Drews' grip, Rentaria hit him "in the top part of the body." *Id.* at 32:19-24.

Drews "asked . . . Wells to tase . . . Ramos because [the officers] could not control him." *Id.* at 36:3–4. Wells unholstered his taser and warned Ramos that he would be tased if he did not stop resisting. *Id.* at 36:3–7. Ramos calmed down, but within seconds of Wells' holstering his taser, Ramos began "aggressively resisting . . . again." *Id.* at 36:6–10, 39:4–8. Drews "basically asked [Wells] to tase . . . Ramos." *Id.* at 36:20–21. Wells drive-stunned Ramos, but Drews testified that he did not know how many times Wells tased Ramos. *Id.* at 39:17–40:13. After the tasing, Drews handcuffed Ramos. *Id.* at 40:16–24.

After Ramos had been tased, handcuffed, and put in a police car, Perez approached Drews and Wells. *Id.* at 58:2–5. Drews told Perez to go into the house and that the officers were "done." *Id.* at 58:9–12. Perez "got up close to [Drews] in [his] face" and told him that he was a

"free man and he could do whatever he wanted to." *Id.* at 58:21–23. Three times Drews told Perez to go into the house, according to Drews' testimony, before he told Perez that he was under arrest for public intoxication. *Id.* at 60:5–10.

Perez pushed Drews as Drews moved to grab his wrist and "punched" Drews' hand. *See id.* at 61:2–13. The two began struggling. *See id.* at 62–63. They grappled "all the way from the one side of the street and ended up towards the end of the driveway," having travelled a distance of about five feet. *Id.* at 62:9–64:14. Wells decided to tase Perez. *Id.* at 64:17–19. During the struggle, Drews testified that he, too, was tased. *Id.* at 65:8–20. Drews handcuffed Perez after Perez was tased. *Id.* at 75:19–21.

### F. The Police Reports

Plaintiffs stress the point that the police reports available to them when they pleaded guilty all stated that Wells, not Drews, tased them, and they were unaware which officer was which when they pleaded guilty. *See* Pls.' ASOF ¶¶ 4–6. Drews wrote a crime report dated May 26, 2012. Pls.' Ex. 6A at 15–17. The summary generally tracked Drews' deposition testimony. *See id.* at 16. The report states that Ramos continued to "actively resist" as Drews and Wells attempted to arrest him. *Id.* At Drews' direction Wells tased Ramos after first warning him that he would be tased if he did not comply. *Id.* The report also states that Wells tased Perez. *Id.* Finally, Rentaria twice pushed Drews in the chest, according to Drews' report dated May 26, 2012. *Id.*

Wells also prepared a crime report regarding the May 26, 2012, incident. *Id.* at 40–41. This report, referred to by plaintiffs as Wells' "original report," e.g., Pls.' ASOF ¶ 17, tracks most of the details of Wells' deposition testimony but does not mention tasing anyone. *See id.*

Regarding Ramos, the report states only that he began to resist as Drews and Wells started to handcuff him. *Id.* No mention of the struggle with Perez is made. *See id.*

Wells prepared a second, undated crime report regarding the events of May 26, 2012. *Id.* at 39. This report was not entered into the Village's database of police reports until June 20, 2012. Resp. to Pls.' ASOF ¶ 24; *see also id.* ¶ 26 (reports have no electronically stored information showing their creation date). Wells' second report mentions tasing plaintiffs Ramos and Perez. Pls.' Ex. 6A at 39. It states that Perez resisted Drews' efforts to arrest him and that Drews told Ramos that he would be tased if he did not cooperate. *Id.* He did not cooperate, and Wells wrote that he drive-stunned Ramos "to the lower left side of [Ramos'] back above the buttocks." *Id.*

Wells' crime report states that Perez began struggling with Drews, and the two went to the ground. *Id.* After Perez was warned and continued to resist, Wells tased the "lower back region of [Perez]," Perez continued to struggle, and Wells "applied an additional discharge." *Id.*

### G. Plaintiffs' Complaints

Defendants discuss the history of plaintiff's multiple amended complaints filed in this action in detail. *See* Defs.' ASOF ¶¶ 14–48. Plaintiffs object to the material in defendants' Local Rule 56.1(a)(3) statement of facts citing superseded complaints on relevance grounds and on the procedural ground than an amended complaint "wipes away prior pleadings." *Chasensky v. Walker*, 740 F.3d 1088, 1094 (7th Cir. 2014) (quoting *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999)) (other citation omitted). The court summarizes the complaints to provide background.

In their original complaint, filed in April 2014, plaintiffs alleged that the officer defendants beat them. Defs.' ASOF ¶ 17 (citing Compl. ¶ 11, ECF No. 1). Plaintiffs named

Drews, Wells, the Village, and defendant Ramos.  Plaintiffs Ramos and Perez alleged that defendants Drews and Wells tased them without justification while they were handcuffed.  Defs.' ASOF ¶ 15 (citing Compl. ¶ 3, ECF No. 1).  Finally, the original complaint included allegations that Drews and Wells, without justification, forcefully handcuffed Rentaria and shoved her into a police car.  *Id.* ¶ 16 (citing Compl. ¶ 10).

Plaintiffs amended their complaint in August 2014 ("First Amended Complaint" or "FAC").  *Id.* ¶ 19.  The amended complaint added allegations that Drews and Wells shoved Ramos and Perez to the ground, that Wells tased Ramos while he was on the ground and handcuffed, and that the officer defendants beat Perez and tased him as they were beating him.  *Id.* ¶¶ 20–21 (citing FAC ¶ 10).   The allegations regarding Rentaria remained unchanged.  *Id.* ¶ 22.

After obtaining leave from this court, plaintiffs filed their Second Amended Complaint ("SAC"), ECF No. 63, in October 2015.  Plaintiffs' depositions had been taken in the interim.  Pls.' Resp. to Defs.' ASOF ¶ 26.  The SAC made allegations generally consistent with plaintiffs' deposition testimony.  *See id.* ¶ 27–28.  In a departure from the prior allegations that Wells did the tasing, the SAC alleged that defendant Drews tased Perez "multiple times," and that Drews charged Ramos and tased him without justification.  *Id.* ¶¶ 28, 29.  In addition to the allegations that the officers forcefully seized Rentaria, the SAC alleged that Drews ran at her, took her phone, and tried to strike her, all without justification.  *See id.* ¶¶ 30–31 (citing SAC ¶ 11).  Separately, plaintiffs alleged that "defendants beat, tased, and assaulted" them.  *Id*. ¶ 32 (citing SAC ¶ 13).

Plaintiffs filed their Third Amended Complaint, ECF No. 94, in February 2016 with leave of court.  The substantive allegations regarding the May 26, 2012, incident did not change.

Resp. to Defs.' ASOF ¶ 36.  Plaintiffs, however, added a claim under Illinois law for negligent spoliation of evidence stemming from the destruction of a taser involved in the incident.  *See id.*

Plaintiffs' Fourth Amended Complaint, ECF No. 127, was filed in July 2016.  This complaint added nine new officer defendants who allegedly "conspired" to cause the spoliation of the taser.  *See* Resp. to Defs.' ASOF ¶ 39 (citing 4th Am. Compl. ¶ 31(d)).  Defendants moved to dismiss the Fourth Amended Complaint, ECF No. 167, and plaintiffs sought leave to amend again rather than respond to the motion, *see* ECF No. 169 at 1.

In November 2016, Plaintiffs filed their Fifth Amended Complaint, ECF No. 172, with leave of court.  This complaint added Taser International, Inc. ("Taser International") as a defendant to the alleged conspiracy pleaded in the previous complaint.  *See* 5th Am. Compl. ¶ 33.  Defendants again moved to dismiss the Fifth Amended Complaint. ECF Nos. 181, 184.  Plaintiffs voluntarily dismissed Taser International as a defendant on January 26, 2017, hours after receiving a Federal Rule of Civil Procedure 11 letter threatening a sanctions motion if the Fifth Amended Complaint was not withdrawn.  Pls.' Resp. to Defs.' ASOF ¶ 43 (undisputed; relevance objection).

Plaintiffs filed their live Sixth Amended Complaint, ECF No. 203, on February 8, 2017.  It added a number of details to the factual basis of the negligent spoliation claim.  *See id.* ¶¶ 38–49.  In addition to the previously discussed spoliation claim concerning the taser, Plaintiffs accuse defendants of agreeing not to report one another's use of excessive force and of "generating or approving false documentation to cover-up for their own and each other's misconduct."  *Id.* ¶ 48(c); *see also id.* ¶ 48.

## H. The Tasers, Taser Logs, And Discovery Conduct

The balance of the parties' evidence and arguments concern the timing and sequence in which evidence came to light during discovery. Plaintiffs contend that this sequence evinces an effort to cover up the use of excessive force, deliberate destruction of an incriminating taser, and an effort to conceal that Drews tased anyone, or even had a taser, on May 26, 2012. Plaintiffs dispute who signed out which taser and claim that the logs and taser information sheet on which defendants rely are unreliable, unauthenticated, and therefore inadmissible. This court need not resolve these objections at summary judgment because if the disputed exhibits are used only as plaintiffs rely on them—as evidence of a cover up and not for the truth of what the logs and data state about who signed out which taser and when it was fired—the summary judgment result would be the same. *See Fidlar Acquisition Co. v. 1st Am. Data Tree LLC*, 2016 WL 1259377, at *10 (C.D. Ill. Mar. 29, 2016); *Noffsinger v. Valspar Corp.*, 2012 WL 895496, at *8 (N.D. Ill. Mar. 15, 2012); *CFM Corp. v. Dimplex N. Am. Ltd.*, 2005 WL 331556, at *12 (N.D. Ill. Feb. 8, 2005).

To establish who had which taser, defendants proffer a taser sign-out sheet dated "5/27" (plaintiffs point out that the year is missing). Defs.' Ex. L, ECF No. 300–12. Deciphering the sheet requires one to correlate defendants' badge numbers and initials with entries on the sheet corresponding to a taser's serial number and the shift during which the taser was checked out. *See id.* According to police reports in the record, Wells is badge number 128; Drews is 176. If admissible, the sheet permits the finding that Wells signed out a taser with a serial number ending in "313" ("313 taser") during the midnight shift on May 26, 2012, *see* Defs.' ASOF ¶¶ 49, 55 (citing Wells' testimony to this affect), and Drews signed out a taser ending in "831" ("831 taser") on May 27, 2012, s*ee* Defs.' ASOF ¶ 51 (citing Drews' deposition testimony).

In 2015, Drews certified during discovery that, based on his review of Village police records, he did not sign out a taser "on the night in question." Defs.' Resp. to Pls.' SOF ¶ 44. Plaintiffs say that he was trying to mislead them. Defendants maintain that Drews' statements resulted from Drews' misunderstanding about which shift he worked. A sign-out sheet that may correspond to May 26, 2012, does not contain Drews' badge number, Defs.' Ex. N at 1, ECF No. 300–14, but Drews testified that he thought he was working a "power shift" (*i.e.,* from 7:00 p.m. on May 26 to 3:00 a.m. on May 27). *See* Defs.' SOF ¶ 52. Drews therefore testified that he looked at the wrong log when he initially determined that he had not checked out a taser. *See id.* Plaintiffs also imply that Wells created the second crime report, mentioning tasing to corroborate Drews report and a false narrative in which Drews had no taser.

The purported sign out sheets were not produced until July 2015, a month after Drews certified that he had not signed out a taser. Defs.' Resp. to Pls.' ASOF ¶ 46. The parties agree that the logs do not establish who carried any particular taser on May 26, 2012. *Id.* ¶ 48. The record also contains purported firing logs downloaded from both tasers, sometimes referred to by the parties as "Taser Information Sheets." *See* Pl.'s Ex. 7A at 1–2 (313 taser), ECF No. 300–19; Pl.'s Ex. 7A at 7–10 (831 taser), ECF No. 300–19. The date on which defendant Blevins downloaded data from the 831 taser is disputed, as are his reasons for doing so. *See* Pls.' ASOF ¶¶ 31–37. While this case was pending, Blevins' computer was "reimaged" (defendants say due to a change in personnel), meaning that any electronic information downloaded from both tasers that was stored on the computer's hard drive was erased. *Id.* ¶ 37; *see also id.* ¶ 87 (giving reason for reimaging). The Village claims to have preserved data about the tasers by printing the logs before reimaging the hard drive, but plaintiffs dispute that assertion, and it seems clear that electronic taser firing logs did not survive the reimaging. *See id.* ¶ 52 and cited material.

Plaintiffs did not learn of the reimaging until June 2017 when their counsel sought to arrange a forensic examination of Blevins' computer. *See id.* ¶ 53 (undisputed, subject to relevance objections).

On September 22, 2012, defendant Blevins sent the 831 taser to Taser International (he says for repairs; plaintiffs claim that this is a cover up), and the company "scrapped" the 831 taser on October 2, 2012. *See* Resp. to Pls.' ASOF ¶¶ 39, 67. Plaintiffs first learned of the destruction of the 831 taser from interrogatory responses received in January 2016. *See id.* ¶ 39 (citing the Village's 2nd Am. 4th Am. Ans. to Interrogs. ¶¶ 4–5, Jan. 8, 2016, Pls.' Ex. 8A). Plaintiffs also point to evidence that defendant Blevins knew that sending the 831 taser to Taser International would result in loss of its data. *See* Pls.' ASOF ¶ 40. And plaintiffs note that in 2015, defendants' counsel told them that no further documents would be produced. *See id.*

Defendants' expert analyzed these logs and prepared a report opining that the 831 taser's trigger was not activated after 3:04:39 p.m. local time (plus or minus six minutes) on May 26, 2012. Defs. Report of B. Chiles 2, Defs.' R., ECF No. 300–18. The other taser, which defendants associate with Wells, was activated four times between 10:51 p.m. and 11:47 p.m. on May 26, 2012, according to defendants' expert. *Id.*

In March 2017, evidence came to light that the cartridges used with the officers' tasers were inventoried and individually identified. *See* Defs.' Resp. to Pls.' ASOF ¶ 77–79. Plaintiffs moved to compel production of the cartridge logs the next month, in April 2017. *Id.* ¶ 80. The Village produced various spreadsheets with cartridge logs, the authenticity and provenance of which are disputed. *See id.* ¶¶ 81–84. The parties do not discuss what, if anything, the logs might reveal about the events of May 26, 2012.

## III. Dismissal For Litigation Misconduct

Defendants devote over half of the argument section of their memorandum in support of their motion for summary judgment to contentions that the court should dismiss this case not on its merits but for plaintiffs' alleged "egregious misconduct" while litigating this case. *See* ECF No. 266 at 5–14. They accuse plaintiffs of "perjury" and invoke this court's inherent authority and Federal Rule of Civil Procedure 37. *Id.* at 5. The parties have argued the sanctions questions as merits issues at summary judgment, so the court first considers them on those terms.

### A. Rule 37 Sanctions Require A Violation of a Discovery Order

Defendants have not shown that they are entitled to relief under Rule 37, which partially governs discovery sanctions. The only arguably applicable provision of the rule allows dismissal as a sanction "[i]f a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)— fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A). Defendants point to no discovery order plaintiffs disobeyed here, so Rule 37(c)(2)(A) is out as authority to dismiss this action. *Greviskes v. Univ. Research Assoc.*, 417 F.3d 752, 759 (7th Cir. 2005).

### B. Under Ordinary Summary Judgment Rules, Fact Questions Preclude Defendants' Request For Dismissal

Defendants also invoke this court's inherent authority to dismiss an action as a sanction for discovery and litigation misconduct "where a party has displayed fault, bad faith, or willfulness." *Id.* (citing *Downs v. Westphal*, 78 F.3d 1252, 1257 (7th Cir. 1996)). The court must find "that there is 'a clear record of . . . contumacious conduct' after considering 'the egregiousness of the conduct in question in relation to all aspects of the judicial process' and considering whether less drastic sanctions are available." *Fuery v. City of Chi.*, 900 F.3d 450, 464 (7th Cir. 2018) (quoting *Barnhill v. United States*, 11 F.3d 1360, 1367 (7th Cir. 1993))

(citation omitted).  In their summary judgment briefing, defendants catalog a series of alleged inconsistencies among plaintiffs' allegations made in various iterations of their complaints, at their depositions, and in interrogatory responses.  *See* Defs.' Mem. Supp. Mot. Summ. J. 7–12; Defs.' ASOF 13–47, 105–47, ECF No. 300.  Defendants posit that these alleged inconsistencies make plaintiffs' claims and testimony "simply not credible."  Mem. Supp. Mot. Summ. J. 7.  Instead, taken together, the record, according to defendants, shows that plaintiffs "told deliberate falsehoods" at depositions and in answers to interrogatories.  *Id.* at 6, 11.  Specifically, defendants claim that the various complaints, interrogatory answers, and depositions are irreconcilable on the following questions: (1) which officer, Drews or Wells, tased plaintiffs and; (2) whether Drews or Wells shoved a plaintiff to the ground before or after handcuffing the plaintiff; (3) whether billy clubs were used; (4) whether an officer ran at one or more of the plaintiffs before using his taser; (5) whether plaintiff Perez passed out after being tased or was lying on the ground for three to four minutes after being handcuffed; (6) whether the plaintiffs' testimony is inconsistent with certain allegations made in earlier complaints that police officers beat them with their hands and feet; and (7) whether the various allegations made in the complaints concerning Drews taking Rentaria's phone are inconsistent with Ramos and Perez's testimony.  *See id.*

Plaintiffs respond that "most if not all of Defendants'" arguments in this regard are based on pleadings that were amended to conform to the facts as revealed throughout the arduous discovery phase of this litigation.  Similarly, most of Defendants' arguments in this regard are based on discovery responses that were subsequently amended."  Pls.' Resp. to Mot. Summ. J. 8, ECF No. 281.

This court cannot, as defendants would have it do, resolve questions of plaintiffs' credibility against them at summary judgment. Defendants rely on their laundry list of alleged inconsistencies to establish the proposition that plaintiffs' deposition testimony lacks "credibility." Mem. Supp. Mot. Summ. J. 7. This court must decline defendants' invitation to weigh plaintiffs' credibility, for elementary summary judgment principles prevent the court from making credibility determinations, such as weighing the effect of a witness' prior, allegedly inconsistent statements on the witness' testimony. *See, e.g.*, *Williams v. City of Chi.*, 733 F.3d 749, 752 (7th Cir. 2013) ("Neither we nor the district court can resolve issues of credibility when deciding a motion for summary judgment or an appeal from its grant . . . . Those are issues for a jury at trial, not a court on summary judgment" (citing *Mullin v. Temco Machinery, Inc.*, 732 F.3d 772, 778–79 (7th Cir. 2013)). Notably here, defendants do not claim that plaintiffs' deposition testimony is inadmissible or, if believed and seen most favorably to plaintiffs, legally insufficient to support liability on an excessive force claim. *See* Mem. Supp. Mot. Summ. J. 6–11. Defendants make much of the degree of alleged inconsistence in this record, but juries routinely resolve similar credibility questions in excessive force cases. *See*, *e.g.*, *Avina v. Bohlen*, 882 F.3d 674, 678–79 (7th Cir. 2018) (reversing grant of summary judgment to police officer based on arrestee's disputed testimony that he was fully cooperative and posed no safety risk when officer used sufficient force to break his wrist while handcuffing him); *Morfin v. City of E. Chi*, 349 F.3d 989, 1005 (7th Cir. 2003) (force could be viewed as objectively unreasonable where officers grabbed arrestee's arm, slammed him against a wall, and took him to the floor). Accordingly, the rule that "on summary judgment, [the court does] not measure the credibility of deposition testimony if it is admissible evidence of . . . liability" governs. *Bombaci v. Journal Cmty. Pub. Grp.*, 482 F.3d 979, 986 (7th Cir. 2007) (citing *Paz v. Wauconda Healthcare and*

*Rehab. Centre,* 464 F.3d 659, 664–65 (7th Cir. 2006) (applying rule in employment discrimination case). Under basic summary judgment rules, then, the jury must weigh the import of the alleged inconsistencies defendants identify. Defendants' motion for summary judgment must be denied on those terms.

### C. As An Exercise Of Inherent Authority, Sanctions Are Not Warranted On This Record

The parties have litigated defendants' request for sanctions as though the jury would be tasked with sifting through the pleadings, depositions, and interrogatories. To the contrary, the court must resolve credibility disputes on a motion for sanctions. Factual disputes presented by discovery motions must generally be presented to the court. Fed. R. Civ. P. 37(a)(2). Likewise, when exercising its inherent authority, this court, not a jury, makes credibility determinations if a hearing is needed.[1] *See Fuery*, *supra*, 900 F.3d at 466 (district court held "several mini-evidentiary hearings"); *Greviskes*, *supra*, 417 F.3d at 756–57 (district court held evidentiary hearing and made credibility determinations before finding that dismissal was warranted). After reviewing the summary judgment record, this court finds no sufficient reason to exercise its inherent authority to dismiss this case for litigation misconduct.

The Seventh Circuit has recently explained "[c]ontumacious conduct that occurs in the presence of the court and disrupts the fairness and integrity of the judicial process requires less process than out-of-court conduct subject to criminal sanctions." *Fuery*, 900 F.3d at 464 (citing *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831–34 (1994)). Defendants

---

[1] Plaintiffs' objection to one summary judgment exhibit illustrates the difference. Citing a venerable case for the proposition that amended pleadings cannot be considered at summary judgment to establish the claims and admissions of a party, they say that their prior complaints should be stricken as summary judgment exhibits along with the paragraphs of defendants' Local Rule 56.1 statements that cite the prior complaints. *See Nisbet v. Van Tuyl*, 224 F.2d 66, 71 (7th Cir. 1955) ("An amended pleading ordinarily supersedes the prior pleading. The prior pleading is in effect withdrawn as to all matters not restated in the amended pleading . . .") (citation omitted).

cite criminal perjury cases in their briefing, making clear the danger they believe plaintiffs face and triggering a relatively high level of due process protection. *See id.*; *see also* Defs.' Mem. Supp. Mot. Summ. J. 6 (citing *United States v. Burge*, 2009 WL 3597950 (N.D. Ill. Oct. 27, 2009) (a criminal prosecution for making knowing false statements in answers to interrogatories during discovery in a civil case).

Given these stakes, due process principles require this court to hold an evidentiary hearing to resolve material factual disputes before imposing the sanctions defendants seek, but the court sees no reason to hold such a hearing at this stage of proceedings and plenty of reasons not to. *Greviskes*, *supra*, provides an example of the sort of outrageous conduct that is sanctionable under a court's inherent authority. Documentary evidence there showed that the plaintiff violated a protective order during discovery by forging a fax to a third party and then taking steps, such as changing her phone number, to cover her tracks. *See Greviskes,* 417 F.3d at 754–55. The defendants here point to no similarly compelling evidence of comparable duplicity. Plaintiffs represent that they amended their complaints and interrogatory responses as evidence emerged in discovery. Resp. to Mot. Summ. J. 8. That representation could of course be false, but again, a hearing would be needed for the court to decide that question. As explained *supra*, Part III. B, the credibility questions here are run of the mill jury questions.

This court's inherent authority embraces the "power to conduct independent investigations in order to determine whether the court has been the victim of fraud or deceit." *United States v. Johnson*, 327 F.3d 554, 561 (7th Cir. 2003) (quoting *Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1200 n.2 (7th Cir. 1996). Nonetheless, an exercise of a court's inherent authority should be approached with caution. *See Fuery*, 900 F.3d at 464 ("[b]ecause of their very

potency, inherent powers must be exercised with restraint and discretion" (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)) (brackets in original).

Here, launching an investigation into the potential inconsistencies on the details of the events of May 26, 2012, without more compelling evidence that they are the product of anything more than, for example, confusion over the questions asked by the lawyers, faded memories, and the like would effectively try the plaintiffs' excessive force claims to this court rather than the jury. That would give defendants' counsel a windfall opportunity to conduct an examination of plaintiffs in preparation for trial. Notably, plaintiffs have not had the opportunity generally afforded a witness to be confronted with and explain an alleged prior inconsistent statement. *See* Fed. R. Evid. 613(b) ("a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires"). To this court's knowledge, defendants did not attempt to redepose plaintiffs about their alleged inconsistent statements made after their depositions, so a pretrial hearing would give defendants a windfall in the form of a potential tactical advantage at trial. Furthermore, holding an evidentiary hearing before trial here would be particularly unjustified on this record because defendants may recover their reasonable attorney's fees for defending truly frivolous § 1983 claims, though the court implies nothing about whether that standard would be met if defendants win at trial. *See generally Fox v. Vice*, 563 U.S. 826, 834–37 (2011) (discussing standards applicable to defendants' requests for attorney's fees under 42 U.S.C. § 1988). If defendants prevail at trial, they are free to renew their request for sanctions, but on this record, the court sees no need for an evidentiary hearing on credibility questions that the jury should resolve. *Cf. Fuery*, 900 F.3d at

465 (noting that district court denied motion for mistrial based on litigation misconduct, reserved right to deal with misconduct after trial, and did so).

### IV. Plaintiff's Excessive Force Claims Are Not Barred By *Heck v. Humphrey*

In *Heck v. Humphrey*, the Supreme Court decided that a plaintiff cannot bring a § 1983 claim that "necessarily impl[ies] the invalidity of his conviction." 512 U.S. 477, 487 (1994). All three plaintiffs here entered guilty pleas in state court to misdemeanor charges arising from the May 26, 2012, incident that is at issue here. Defs.' Resp. to Pls.' ASAF ¶¶ 1–3. In *Evans v. Poskon*, 603 F.3d 362 (7th Cir. 2010), the Seventh Circuit held that a § 1983 plaintiff who has been convicted of resisting arrest "can only proceed to the extent that the facts underlying the excessive force claim are not inconsistent with the essential facts supporting the conviction." *Helman v. Duhaime*, 742 F.3d 760, 762 (7th Cir. 2014) (summarizing the holding in *Evans*). Similarly, "a plaintiff's conviction for assaulting a police officer does not 'necessarily imply' that the officer used appropriate force during the course of arrest after the assault." *Viramontes v. City of Chi.*, 840 F.3d 423, 427 (7th Cir. 2016) (quoting *Gilbert v. Cook*, 512 F.3d 899, 901 (7th Cir. 2008)). Were the rule otherwise, an officer could use excessive force with impunity after an arrestee posed no further threat. *See id.* To apply the *Heck* rule here, the court must "consider the factual basis of the claim and determine whether it necessarily implies the invalidity of [the plaintiffs'] conviction[s]." *Helman*, 742 F.3d at 762. The court cannot make this comparison properly on the present record because exactly what plaintiffs admitted when they pleaded guilty is not at all clear.

### A. The Facts And Claims In This Lawsuit

Starting with the facts and claims in this suit, plaintiffs rely primarily on their deposition testimony for their versions of key events of May 26, 2012. S*ee* Pls.' SAF ¶¶ 7–15 (citing Defs.'

Ex. 2–4).  The court has reviewed those depositions in their entirety and can find no testimony suggesting that any plaintiff shoved defendants Drews or Wells at any time—before or after they were tased, and no plaintiff mentions Rentaria disobeying a directive or walking toward a police officer.  According to plaintiffs' depositions, police officers tased them after they were handcuffed and while they were compliant (and they were always compliant).  *E.g.*, Ramos Dep. 18:19–19:3, 61:13–16, Defs.' Ex. 2, ECF No. 300–28.

Defendants Drews and Wells contradicted this testimony at their depositions, *e.g.,* Drews Dep. 27:14–33:8, Defs. Ex. O, ECF No. 300–15.  Under defendants' versions of the facts, tasers were deployed during a general melee precipitated by plaintiff Ramos and Perez's verbally and physically aggressive behavior.  *See id.* at 36:3–41:19.  Both officers testified that they tased plaintiffs while their hands were free (or had only one hand cuffed) and while both men continued to struggle and resist arrest.  *Id.* There are inconsistencies with these narratives in the police reports, and there is evidence that some of the reports falsely state that plaintiff Perez was tased in the back.  *See* Defs. Ex. 6A at 8.  A picture of the wound taken later that night shows the wound was on his chest.  *See* Pls.' Ex. 3, ECF No. 282–3 at 10–12.

## B.  The Facts Defendants Admitted In State Court

Defendants have provided the court with excerpts from defendants' felony charging documents, plea hearing transcripts in state court, and responses to requests for admission regarding their convictions.  *See* Defs.' ASOF ¶¶ 1–12 (citing and quoting portions of Defs.' Ex. A–I).  The charging documents show some of the facts comprising the basis of the initial charges against defendants, but they do not show which, if any, facts plaintiffs admitted when the charges were reduced to misdemeanors.  *See, e.g.,* Defs.' Ex. A at 10.  Defendants provide transcripts of plaintiffs' plea hearings, but the transcripts are incomplete.  *See* Defs.' Ex. B, E, H.  The excerpts

in the record cover discussions with the state trial judge regarding each plaintiffs' constitutional rights, but the court can find no description of the offense conduct admitted.

The only description of the offense given by the parties tracks exclusively each plaintiff's response to a 3-page request for admission ("RFA") propounded by defendants. *See* Pls.' Ex. 2, ECF No. 282–2; *see also* Pls.' Resp. to Defs.' Mot. Summ. J. 12–13, ECF No. 281 (citing Pls.' ASAF ¶¶ 4–6, which in turn rely solely on the RFA's). Each set of RFA's sets forth the statute of conviction, confirms that the plaintiff was present in state court for the plea, and describes the offense in a short sentence. *See* Pls.' Resp. to RFA's ¶ 3 (respectively), ECF No. 282–2.

The RFA's summaries of plaintiffs' convictions sound like charging documents, not the sorts of more detailed fact summaries which a defendant admits at a plea hearing. Indeed, the language they use tracks the one-sentence offense descriptions in each plaintiff's certified record of conviction made a part of the summary judgment record. *See* Defs.' Ex. C, F, I. According to these summaries, Plaintiffs Ramos and Perez each pleaded guilty "to pushing Robert Drews in the chest without lawful justification on May 26, 2012," and plaintiff Rentaria "performed a substantial step towards the commission of the offense of obstructing a peace officer and that she began to take steps toward Horacio Perez, a person being arrested by the police, after being told by the police to step back." *See* Pls.' Resp. to RFA's ¶ 3 (respectively), ECF No. 282–2. Plaintiffs quote these descriptions of the offenses in their response to defendants' motion for summary judgment. ECF No. 282 at 12–13.

## C. Heck Does Not Bar Plaintiffs' Excessive Force Claims

To reiterate, a judgment in favor of a plaintiff on a § 1983 excessive force claim does not imply the invalidity of a battery conviction if the jury could find that the arresting officer used unreasonable force after the battery occurred. *Viramontes*, 840 F.3d at 427; *Gilbert v. Cook*, 512

F.3d 899, 901 (7th Cir. 2008).  To illustrate, the plaintiff in *Gilbert*, a prisoner, had been found

guilty of punching prison guards as they tried to handcuff him.  512 F.3d at 900.  The prisoner

alleged that the guards responded with more force than was reasonably necessary, wrenching his

arm with enough force to separate his shoulder.  *Id.  Heck* did not preclude the plaintiff's Eighth

Amendment claim because "[a]n argument along the lines of 'the guards violated my rights by

injuring me, whether or not I struck first' does not present the sort of inconsistency that doomed

[the] suit" under *Heck.  Id.* at 902 (distinguishing *Okoro v. Callaghan*, 324 F.3d 488 (7th Cir.

2003)).

When the record here is viewed in the light most favorable to the plaintiffs, the sparse

descriptions of the offense conduct plaintiffs admitted in state court permit a finding running

along the same lines.  Plaintiffs Ramos and Perez admitted to pushing a police officer at some

time on May 26, 2012, and plaintiff Rentaria admitted taking a step towards the officers after

being told to step back.  *See* Defs.' Ex. C at 1; Defs.' Ex. F at 1; Defs.' Ex. I at 1.  Nothing in the

present record says whether plaintiffs admitted in state court that a struggle occurred, as Drews

and Wells testified, or whether the shoves and step occurred before or after each plaintiff was

handcuffed.  *See id.*  Thus, a jury could reasonably find that the only facts this court knows

plaintiffs admitted in state court, that Ramos and Perez shoved the officers and Rentaria took a

step toward them, are true, but defendants Wells and Drews overreacted and used excessive force

when arresting plaintiffs and after they were secured in handcuffs.[2]  Those findings would be

compatible and so would not offend *Heck.  See Gilbert*, 512 F.3d at 901 ("A contention that a

guard struck back after being hit is compatible with *Heck*.  Otherwise guards (and for that matter

---

[2] Because the court's analysis does not depend on the exhibits made the subject of plaintiffs' motion to strike, the court need not reach the motion in this part of its opinion.

any public employee) could maul anyone who strikes them, without risk of civil liability as long as the private party is punished by criminal prosecution or prison discipline for the initial wrong."). *Evans v. Poskon*, 603 F.3d 362, 363 (7th Cir. 2010) (claim that § 1983 plaintiff did not resist arrest was *Heck*-barred, but claims that officers used excessive force when taking him into custody and beat him once he was in custody were not); *VanGilder v. Baker*, 435 F.3d 689, 692 (7th Cir. 2006) (plaintiff's excessive force claim not barred by *Heck* because admission that he initially resisted a blood draw was compatible with claim that "he suffered unnecessary injuries because [a police officer]'s response to his resistance—a beating to the face that resulted in bruises and broken bones—was not, under the law governing excessive use of force, objectively reasonable.").

The court recognizes that the portions of plaintiffs' hearing transcripts not in the record provide some context for the facts admitted. But this court cannot assume at summary judgment that evidence the defendants left out of exhibits would be favorable to them. *See Iowa Ham Canning, Inc. v. Handtmann, Inc.*, 870 F. Supp. 238, 245 (N.D. Ill. 1994) (refusing to "assume facts in a light favorable to the movants" at summary judgment). Because they provide context, transcripts of plea hearings ordinarily play an important, even pivotal, role in cases applying *Heck*. *See, e.g.*, *Helman*, 742 F.3d at 673 (plaintiff argued he did not admit key facts at plea hearing); *Ruffin v. Kane Cty. Sheriff Dep't*, 2006 WL 2088186, at *2 n.2, 3 (N.D. Ill. July 21, 2006) (taking judicial notice of transcript of plea hearing). Indeed, the Seventh Circuit held in *VanGilder v. Baker*, 435 F.3d 689, 692 (7th Cir. 2006), that the *Heck* bar did not apply to an § 1983 excessive force claim in part because the plaintiff did not "challenge the factual basis presented at his change of plea hearing." Put simply, no party has provided the court with the complete transcripts that may support such a finding, so defendants have not shown that they are

entitled to judgment as a matter of law. *See Baker v. McCarthy*, 2014 WL 1409414, at *2 (N.D. Ill. Apr. 11, 2014) (stating that record containing a state court docket sheet and conviction certification was inadequate to perform a *Heck* analysis).

### V. Remaining Claims: Spoliation, Conspiracy To Deny Access To Courts, Respondeat Superior, and Indemnity

Defendants' remaining arguments for the most part concern plaintiff's spoliation claims and conspiracy claims under state and federal law. Defendants urge the court to exercise its discretion to dismiss plaintiffs' state law claims under the supplemental jurisdiction statute, 28 U.S.C. § 1367(c), on the assumption that this court would dismiss all of plaintiffs' claims arising under federal law. The supplemental jurisdiction statute provides that "The district courts may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). This court has not dismissed all of plaintiffs' claims arising under federal law, however, see 28 U.S.C. § 1331 (granting original jurisdiction over claims "arising under" federal law), and so dismissal of plaintiffs' state law claims under § 1367(c)(3) i) is inappropriate. With that in mind, the court turns to plaintiffs' spoliation claims and conspiracy claims.

### A. Spoliation Claim

In Illinois, "spoliation of evidence is a tort that can be pled under existing negligence principles, not as a separate intentional tort." *Olivarius v. Tharaldson Prop. Mgmt., Inc.*, 695 F. Supp. 2d 824, 829 (N.D. Ill. 2010) (citing *Boyd v. Travelers Ins. Co.*, 652 N.E.2d 267, 269–70 (1995)) (noting that spoliation claim can be asserted in the underlying suit). To prevail on a negligent spoliation claim, the plaintiff must "prove the traditional four elements of negligence: a duty to preserve the evidence; breach of that duty by loss of the evidence; that the loss proximately caused the plaintiff's inability to prove his underlying claim; and actual damages as

a result." *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 608 (7th Cir. 2016) (citations omitted).

At summary judgment, plaintiffs focus on the release of the 831 taser from its chain of custody[3] as the basis of their spoliation claim. *See* Pls.' Resp. to Mot. Summ. J. 15–16, ECF No. 281. Defendants contend that they had no duty to preserve the 831 taser or the logs and data from it because plaintiffs were alleging in their complaints that Wells, not Drews, tased them when the 831 taser, the taser Drews signed out that night, was released from the chain of custody. Defs. Mem. Supp. Mot. Summ. J. 18–19, ECF No. 266.

The analysis starts with the general rule that "Illinois law imposes no general duty to preserve evidence." *Schaefer*, 839 F.3d at 609. To prove that defendants owed them a duty of care, plaintiffs must establish two conditions, referred to as a "relationship condition" and a "foreseeability condition." Id. at 609 (citing *Dardeen v. Kuehling*, 821 N.E.2d 227, 231 (2004)). For relationship condition to be satisfied, "the duty must 'arise[ ] by agreement, contract, statute, special circumstance, or voluntary undertaking.'" *Id.* (quoting *Dardeen*, 821 N.E.2d at 231). If a relationship giving rise to a duty to preserve exists, the "foreseeability condition" requires the duty to preserve to "extend[ ] to the evidence at issue—i.e., whether a reasonable person should have foreseen that the evidence was material to a potential civil action." *Id.* (quoting *Dardeen*, 821 N.E.2d at 831).

In their response to defendant's motion for summary judgment, plaintiffs argue, without citing any authority, that the Village of Carpentersville's police department is a law enforcement agency and that the individual defendants were its employees. ECF No. 281 at 15. That much is undisputed. Plaintiffs then reason that "[i]t would be difficult to disagree with the belief that a

---

[3] Plaintiffs refer to the September 22, 2012, mailing of the 831 taser to Taser International as a release from its chain of custody, so the court does as well. Nevertheless, it is unclear to what chain of custody plaintiffs refer.

law enforcement agency has a duty to ensure the public trust in its law enforcement activities and has a duty [to] preserve electronic data and ensure accuracy in its reporting and record keeping," including the 831 taser and associated logs and data. *Id.* at 15. Finally, plaintiffs note that the criminal proceedings against them were pending when Drews released the 831 taser from its chain of custody. *Id.* at 17.

Plaintiffs fail to create a fact issue on the relationship condition. Illinois courts require a plaintiff to "show that an 'agreement, contract, statute, special circumstance, or voluntary undertaking' gave rise to a duty by the [defendant] to preserve" evidence. *Castillo v. Bd. of Educ. of City of Chi.*, 103 N.E.3d 596, 602 (Ill. App. Ct. 2018) (quoting *Martin v. Keeley & Sons, Inc.*, 979 N.E.2d 22, 28 (2012)). Regarding the pendency of criminal proceedings, Illinois law makes "clear that mere possession of the evidence is not enough to impose a duty. Nor is being the plaintiff's employer, or being a potential litigant." *Schaefer*, 839 F.3d at 609 (citing *Martin*, 979 N.E.2d at 31–32). As for the generalized duties plaintiffs mention, few would disagree that preserving the public trust and ensuring the accuracy of recordkeeping are laudable objectives in the abstract, but plaintiffs must identify something more concrete, such as a statute, to avoid the "general rule" that "there is no duty to preserve evidence." *Castillo*, 103 N.E.3d at 662 (quoting *Martin*, 979 N.E.2d at 28). Plaintiffs cite no statute creating a duty to preserve a taser involved in an arrest and associated electronic records, particularly where the police reports at the time did not show that the taser was involved in the incident.[4] *See* Resp. to Mot. Summ. J. 16–17. Nor do they try to fit their theories into one of the recognized exceptions to Illinois' general "no duty to preserve" rule. *See id.* Though the court is not required to conduct research

---

[4] One could argue, though plaintiffs do not, that the evidence here, in the underlining criminal case, was subject to the disclosure requirements of *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny. However, in this civil case, "there is no evidentiary presumption that negligently lost evidence is favorable to the plaintiff" under Illinois law. *Schaefer*, 839 F.3d at 611 (citing *Boyd*, 652 N.E.2d at 270).

for plaintiffs, the only two cases the court could locate involving police departments disposed of spoliation claims on grounds unrelated to the duty to preserve. *See Duran v. Town of Cicero*, 653 F.3d 632, 644 (7th Cir. 2011) (seizing video recording device at most interrupted process of creating evidence but; evidence was not destroyed); *Grayson v. City of Aurora*, 157 F. Supp. 3d 725, 748–49 (N.D. Ill. 2016) (destruction of evidence did not deprive plaintiff of the ability to prove the underlying claim). Plaintiffs have therefore failed to develop adequately an argument that defendants owed them a duty to preserve the 831 taser and the associated logs.

### B. Conspiracy To Deny Access To The Courts

Plaintiffs bring a claim for conspiracy to interfere with their right of access to the courts. A "conspiracy itself is not an independent basis of § 1983 liability; there must be an underlying constitutional injury or the attendant conspiracy claim necessarily fails." *Hobbs v. Cappelluti*, 899 F. Supp. 2d 738, 753 (N.D. Ill. 2012) (citing *Hill v. City of Chi.*, 2009 WL 174994, at *9 (N.D. Ill. Jan. 26, 2009)). The Seventh Circuit has recognized that one such right is the right of access to the courts. *Thompson v. Boggs*, 33 F.3d 847, 852 (7th Cir. 1994); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1260–61 (7th Cir. 1984). Thus, a plaintiff may bring a § 1983 claim for damages where a "conspiracy . . . prevent[s] a full and open disclosure of facts crucial to the cause of action, rendering hollow the plaintiffs' right of access." *Vasquez v. Hernandez*, 60 F.3d 325, 329 (7th Cir. 1995) (citing *Bell*, 746 F.2d at 1261). Defendants argue that plaintiffs suffered no "concrete injury" from the cover-up they allege occurred here. Mem. Supp. Mot. Summ. J. 16.

Plaintiffs and defendants quote extensively from *Vasquez*, in which the Seventh Circuit considered a cover-up of evidence that Cicero, Illinois police officers were engaged in illegal target practice when a stray bullet hit the plaintiff. *See* 60 F.3d at 326–27. A police task force

investigated further, and the facts came to light within six months. *Id.* at 327. The plaintiffs then

sued the officers. *Id.* On the case's facts, the Seventh Circuit held that the plaintiffs were not

denied their right of access to the courts. *Id.* at 328–329. The *Vasquez* majority stressed that

"[t]here are no allegations claiming that the [plaintiffs] have been prevented from pursuing a tort

action in state court or that the value of such an action has been reduced by the cover-up." *Id.* at

329.

The plaintiffs here say that defendant's conduct hindered their ability to assert their

spoliation claim and to identify Drews as the alleged officer who tased them for more than 44

months, until they learned that the 831 taser had been released from its chain of custody. Resp.

to Mot. to Dismiss 18, ECF No. 281. Plaintiffs also point to defendants' reimaging of the

computer onto which the taser logs were downloaded, the alleged concealment of the taser sign-

out log until July 2015, the fact that the cartridge sign-out logs did not come to light until March

2017, and questions they have raised about the reasons for downloading the data. *See id.*

Finally, plaintiffs argue that their ability to bring their spoliation claim was hindered because

they did not know which officer was Wells and which was Drews. *See id.* at 19; *see also* Resp.

to Pls.' ASOF ¶ 4–6.

Even viewed in the light most favorable to them, the interference plaintiffs point to here

is like the delay found inadequate in *Vasquez*. Plaintiffs focus only on their spoliation claim

because the facts surrounding their excessive force claims, with the possible exception of which

officer was which, were known to them, so no interference with plaintiffs' ability to bring

excessive force claims occurred on this record. *See Thompson v. Boggs*, 33 F.3d 847, 852 (7th

Cir. 1994) (excessive force claim; affirming dismissal of claim for interference with right of

court access, reasoning that "plaintiff Thompson herein was not deprived of adequate, effective,

or meaningful access to the courts because he was personally involved in the incident and thus had firsthand knowledge of all the facts and circumstances surrounding his arrest"). That leaves plaintiffs with their claim that they have been hindered in their ability to bring a spoliation claim, a sort of spoliation-of-spoliation theory. But, as in *Vasquez*, plaintiffs here do not explain how the value of their state law spoliation claim has been diminished by defendants' alleged interference, which interference appears to be the alleged spoliation itself. *See Vasquez*, 60 F.3d at 329. Plaintiffs have had the opportunity to incorporate, and have incorporated, each instance of alleged spoliation into their arguments, and defendants do not claim that the spoliation claim is time-barred.[5] As for defendants' alleged refusal to explain why certain logs were downloaded, plaintiffs do not explain why ordinary civil discovery was, or would be, an inadequate remedy. *See* Resp. to Mot. to Dismiss 18–19. Because plaintiffs' claims amount to the sorts of delay that *Vasquez* holds do not amount to actionable interference with access to the courts, plaintiffs' claim for conspiracy to interfere with that right must be, and is, dismissed.[6] *See Vasquez*, 60 F.3d at 329; *see also Whitfield v. Ill. Dep't of Corr.*, 2004 WL 1803350, at *1 (N.D. Ill. Aug. 5, 2004) (explaining that a plaintiff must allege that he suffered "prejudice such as missed court deadlines, failure to make timely filings or dismissal of legitimate claims" to show denial of access to the courts); *Davenport v. City of Chi.*, 653 F. Supp. 2d 885, 892 n.6 (N.D. Ill. 2009) (dismissing claim for denial of access to the courts because plaintiff who had legal papers confiscated did not "allege that Defendants' conduct impeded her ability to fully and timely file [a] response, or resulted in the dismissal of legitimate claims.").

---

[5] Defendants claim that this conspiracy claim is untimely but the court need not reach that issue.
[6] This is not to say that all's well that ends well in litigating a spoliation claim. The Federal Rules of Civil Procedure provide potent remedies for discovery misconduct. *See generally* Fed. R. Civ. P. 37, 11.

### C. Respondeat Superior

The Village argues that plaintiffs' respondeat superior count must be dismissed to the extent plaintiffs seek to hold the Village liable for the individual defendants' conduct under § 1983 on such a theory. Defs.' Mem. Supp. Mot. Sum. J. 19–20. Section 1983 does not permit a municipality to be held liable for damages based on the bare fact that the person who harmed the plaintiff was acting in the course and scope of employment with the municipality, that is on a respondeat superior theory. *Monell v. Dep't of Soc. Servs. of NYC*, 436 U.S. 658, 692–95 (1978); *Lennon v. City of Carmel*, 865 F.3d 503, 508 (7th Cir. 2017).

Plaintiffs talk past this argument in their response, citing a single case applying Illinois respondeat superior principles to claims brought under state law. *See Moss v. Singleton*, 110 F. Supp. 3d 876, 885–87 (N.D. Ill., 2015) (analyzing counts brought "pursuant to Illinois' Wrongful Death and Survival Acts"). Plaintiffs have therefore offered no argument against dismissing their respondeat superior count to the extent it seeks to hold the Village liable under § 1983, rather than state law. The court accordingly dismisses the respondeat superior count insofar as it applies to plaintiffs' § 1983 claims.

### D. Indemnity Claim Against The Village

Count IV of the Sixth Amended Complaint asserts an indemnity claim under 745 ILCS 10/9-102, against the Village for payment of any compensatory damages awarded against the individual defendants. ECF No. 203 at 13. Defendants contend that this count should be dismissed because it states the law. This count, the Village argues, "contains a mere recitation of state law and not an individual claim or basis of liability against the defendants." Mem. Supp. Mot. Summ. J. 20. Defendants cite no authority in support of their position, and they do not elaborate further. *See id.* Consequently, defendants have waived this argument. *See Bass v.*

*Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 n.1 (7th Cir. 2014) ("Without any further analysis or citation to authority, we find this argument waived." (citing *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009)).

Moreover, regarding compensatory damages, Illinois law requires the Village "to pay judgments entered against [the individual defendants] if they were acting under color of state law and within the scope of their employment." *Moss*, 110 F. Supp. 3d at 886 (citing *Askew v. Sheriff of Cook Cty.,* 568 F.3d 632, 636 (7th Cir. 2009)) (other citation omitted); *but see Winston v. O'Brien*, 773 F.3d 809, 814 (7th Cir. 2014) (indemnification for attorney's fees is discretionary); 745 Ill. Comp. Stat. 10/2-302 (West 2018) (indemnification for punitive damages is not required). It is undisputed here that the individual defendants acted in the course and scope of their employment with the Village at all relevant times. Resp. to ASOF at 2–4 ¶¶ 4–14. Accordingly, the motion to dismiss the indemnity count is denied. *See Moss*, 110 F. Supp. 3d at 886 (denying request to dismiss indemnity count at summary judgment for the same reason).

## VI. Conclusion

For the reasons stated, plaintiffs' motion to strike, ECF No. 304, is granted in part and denied in part, and defendants' motion for summary judgment, ECF No. 268, is denied.


Date: October 16, 2018

_____/s/_____
Joan B. Gottschall
United States District Judge